# GERAGOS & GERAGOS

A PROFESSIONAL CORPORATION
LAWYERS
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411
TELEPHONE (213) 625-3900
FACSIMILE (213) 232-3255
GERAGOS@GERAGOS.COM

MARK J. GERAGOS          SBN 108325
BEN J. MEISELAS          SBN 277412
Attorneys for Plaintiff JOSEPH WEINBERG

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH WEINBERG, an individual; | Case No.: **8:15-cv-01260-DOC-KES** |
| Plaintiff, | **DECLARATION OF ALEX ALARCON** |
| vs. | |
| VALEANT PHARMACEUTICALS INTERNATIONAL, a Delaware corporation; MEDICIS PHARMACEUTICAL CORPORATION, a Delaware corporation; OBAGI MEDICAL PRODUCTS, INC., a Delaware corporation; BAUSCH & LOMB INCORPORATED, a New York corporation; and DOES 1 through 50, inclusive; | |
| Defendants. | |

# DECLARATION OF ALEX ALARCON

I, Alex Alarcon, hereby declare as follows:

1.     I am an attorney duly licensed to practice before this Court and am an associate at Geragos & Geragos, APC, attorneys of record for Plaintiff Joseph Weinberg in this matter. I have personal knowledge of the facts in this declaration and if called upon as a witness, I could and would testify thereto.

2.     True and correct copies of excerpts from the Deposition of Joseph Weinberg are attached hereto as Exhibit "A."

3.     True and correct copies of excerpts from the Deposition of Jeremy Muir are attached hereto as Exhibit "B."

4.     True and correct copies of excerpts from the Deposition of Jerzy Janeczko are attached hereto as Exhibit "C."

5.     A true and correct copy of an email chain between Plaintiff Joseph Weinberg and Alison Hardgrove, dated August 4-5, 2013, is attached hereto as Exhibit "D."

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 14th day of November, 2016, in Los Angeles, California.

ALEX ALARCON

Exhibit "A"

10:44:42  1  concerned about the answer.  I just want to make

2  sure that if I have an offline discussion with your

3  counsel about the parties -- that's the only reason

4  why I asked.  I just want to make sure that we're in

10:44:52  5  agreement that your -- as you say on paper your

6  employer was Valeant Pharmaceuticals North America

7  LLC.

8          Now, does this document accurately reflect

9  the title that you assumed when you joined Valeant?

10:45:05 10      A    No.

11      Q    Okay.  It says here "converged

12  infrastructure engineer."  What -- what title did

13  you take when you joined Valeant?

14      A    It was senior converged infrastructure

10:45:19 15  engineer.

16      Q    Okay.  And --

17      A    I don't know that actually on this

18  document that it would necessarily reflect that even

19  though that's by any -- if anybody asked that would

10:45:33 20  have been the working title absolutely.

21      Q    Okay.  Fair enough.

22      A    Also, I wanted to finish about the Valeant

23  Pharmaceuticals International.

24          The reason why I felt that Valeant

10:45:43 25  Pharmaceuticals -- the reason why I said Valeant

33

| | |
|---|---|
| 10:45:43 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 10:45:58 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 10:46:08 | 10 |

10:45:43  1  Pharmaceuticals International was because it was

2  my -- the reason why this is on here like that is

3  because my payroll happened out of -- out of the

4  U.S. but I worked on systems globally.  I worked on

10:45:58  5  the international systems, I worked on Canadian

6  systems, I worked on all of the systems for

7  subsidiaries that were global -- Bausch & Lomb is

8  global -- all of these things.

9         Q     Okay.  Now, Bausch & Lomb had not been

10:46:08  10  acquired by Valeant while you worked there; correct?

11         A     It had not completed.  It was -- it was

12  announced --

13         Q     Okay.

14         A     -- when I was there.

10:46:16  15         Q     Now, who was -- when you joined Valeant,

16  who was your supervisor?

17         A     The person on paper that I reported to was

18  Steve Schiavone.  He was -- he was the highest

19  technical person and leadership person outside of

10:46:38  20  Jerry.

21         Q     Now, where were you --

22         A     Jerry J.

23         Q     Oh.  No, no.  I'm sorry.

24               Where did you work out of?  What location?

10:46:48  25         A     I worked out of the location in Arizona --

34

10:46:54  1    on Dobson Road in Scottsdale, Arizona.

2         Q      Okay.  So if we call it "the Scottsdale

3    location" --

4         A      Yes.

10:47:03  5         Q      -- we're talking about the location on

6    Dobson Road?

7         A      Yes.

8         Q      Okay.  And was Mr. Schiavone based in

9    Scottsdale as well?

10:47:15  10       A      He was.

11        Q      Was he -- was he based at the same office

12   you were in?

13        A      He was.

14        Q      Okay.  And in your role as senior

10:47:27  15   converged infrastructure engineer, who did -- did

16   you consider yourself to have a team, like an IT

17   team or a team of other infrastructure engineers?

18        A      Yeah, we had a -- we had a team that

19   really oversaw and directed all the infrastructure

10:47:47  20   for Valeant globally.  And that was primarily split

21   in between New Jersey and Arizona.

22        Q      And on a -- so you would work with the

23   New Jersey team remotely.  And those in Arizona,

24   would they share an office with you?

10:48:12  25       A      Yes.  We were located in the same office.

**35**

11:43:33 1  that you believe was improper?

2          A     I was asked to give credentials so that

3   Jacob could use those credentials to gain access

4   into those systems to help him do business with his

11:43:46 5  personal Nigerian financial firm.

6          Q     Okay.  And who asked you -- who

7   specifically asked you to give credentials?

8          A     Jacob Alao.

9          Q     And what specifically did he say to you in

11:44:14 10 making that request?

11         A     He asked me if I -- well, first -- but

12  there's -- there's some background behind that,

13  but --

14         Q     What specifically did he say to you when

11:44:26 15 you were asked to give credentials to Jacob in

16  connection --

17         A     He --

18         Q     -- with this first example?

19         A     He -- well, first he asked me if I wanted

11:44:36 20 to make some more money, some serious money.  And I

21  told him, "Absolutely.  Who wouldn't?"

22         Q     Okay, let's -- okay.  What specifically

23  did Jacob ask you to do in requesting those

24  credentials?  What did he -- was this a verbal

11:44:57 25 comment, or did he e-mail you?

69

11:44:59   1          A     This was a verbal conversation.

           2          Q     Okay.  And what did Mr. Alao say to you in

           3     asking that you give him credentials to the -- in

           4     this situation?

11:45:14   5          A     He said if I gave him the local

           6     administrator credentials and the service account

           7     credentials that I could make some serious money.

           8          Q     What else did he say?

           9          A     He said that he had a financial firm in

11:45:29  10     Nigeria where he was able to get -- use those

          11     credentials to gain access to credit cards and other

          12     means, and that he would sell that information and

          13     that we would be able to buy $100,000 cars like

          14     pizzas.

11:45:49  15          Q     When did you have this discussion with

          16     Mr. Alao?

          17          A     It was my second interaction with him.  It

          18     was sometime in the middle of June of 2013.

          19          Q     And where did this conversation take

11:46:08  20     place?

          21          A     It took place in -- I called it the server

          22     room, but it was really more of like a utility-type

          23     closet.  It had a lot of equipment in there.  Some

          24     of it was operational and some was not.

11:46:18  25          Q     And was anybody else present during this

                                                                      70

11:48:04 1      A    I told him that I couldn't take part in
2   something like that.

3      Q    And what did he -- what else?  Did you say
4   anything else in that response?

11:48:14 5      A    No.  No, I got up -- it was -- it was an
6   awkward conversation.  I didn't expect -- I didn't
7   expect that.  I was just showing up to work.

8      Q    Did he say anything further in response to
9   you?

11:48:28 10     A    Later.  It wasn't at that moment because I
11  got up and I walked out.

12     Q    And what did he say to you later?

13     A    He told me later, "You better remember who
14  you work for."

11:48:40 15     Q    Did he tell you anything else?

16     A    He -- he said some terrible things to me.

17     Q    In connection with -- anything in
18  connection with requesting the credentials itself?

19     A    I believe that when we had another
11:49:00 20 meeting -- I want to say that it was within a week
21  or so later -- that since I would not take part in
22  that and I was the only person with all of the
23  access to all of these specific systems that he was
24  looking for, I believe that that's the reason why
11:49:18 25 he -- he mentioned that -- I went into a room --

72

11:49:23  1    excuse me.

2                 I went into a meeting, and in that meeting

3    it was just him and I in there, at least in the

4    beginning.  This was -- this was before -- this was

11:49:35  5    before a little bit.  And he told me that -- I

6    viewed it as a threat.  He told me a story about

7    how -- how Valeant had asked for multiple years the

8    founder of Medicis -- his name is Jonah Shacknai --

9    how they had tried to acquire that company, but he

11:50:05  10   had refused for years.  And then he told me how he

11   thought it was funny how Jonah Shacknai's girlfriend

12   had committed suicide and was hanging naked off of

13   her balcony and also how her son had accidentally

14   died around the same time.

11:50:32  15        Q    His son you mean?

16        A    No, the son of Jonah Shacknai's

17   girlfriend.  It was a 12-year-old boy that died, and

18   he told me how funny it was how that happened and

19   how Valeant had asked to acquire Medicis for that

11:50:52  20   period of time and -- how funny it was that after

21   his life was in a shambles Valeant then showed up

22   and asked to acquire the company one more time.

23        Q    And how did you view that as a threat?

24        A    I -- I viewed it because this was not

11:51:12  25   terribly long after -- after he had asked me to get

                                                              73

11:57:33  1   credentials?

2       A    I asked -- I asked Steve -- I asked him

3   why he didn't have a handle on Jacob, and Steve told

4   me that Jacob was a menace -- a menace to the

11:57:48  5   company, a menace to him -- but he told me that it

6   was impossible to control him if he was not there in

7   Scottsdale.

8       Q   And Jacob was subordinate to Steve;

9   correct?

11:58:04 10       A   On paper, yes, but like I said, he -- he

11   was getting consultants in on his own without Steve

12   knowing.  He was making financial decisions, company

13   technical decisions without Steve knowing.  And I

14   let Steve know that there was some -- that there was

11:58:23 15   a lot of issues around that.

16       Q   What else, if anything, did you say to

17   Mr. Schiavone with respect to Jacob's alleged

18   request for the administrator credentials?

19       A   I -- I told him that I was going to talk

11:58:46 20   with Craig about some of the other issues that we

21   had.

22       These weren't necessarily fraudulent

23   activities that existed, but it was more so just

24   operational and damaging things that I felt that

11:59:02 25   Jacob was putting me into to try and make it so that

79

13:33:54  1   Alison Brunger and Jacob Alao would be -- would be

2   the two primaries.

3        Q    Okay.  And you -- and you disclosed your

4   status -- your MS condition --

13:34:03  5        A    Yes.

6        Q    -- to Mr. Alao in the interview process

7   before you were hired?

8        A    Yes, yes.

9        Q    When did you first tell Alison Brunger

13:34:14  10   that you suffered from -- actually, strike that.

11            To your knowledge, did Mr. Alao approve

12   your hiring?

13        A    Yes.

14        Q    When did you first disclose to --

13:34:27  15        A    Him and Joseph Beatty, I believe.

16        Q    When did you first disclose to Alison

17   Brunger that you suffered from MS?

18        A    I -- I've -- I put it in my paperwork when

19   I started at the company.

13:34:44  20        Q    What paperwork?

21        A    I'm pretty sure.

22            My on-boarding.  I believe there's a check

23   mark -- there was a check box for that in their

24   internal system that they had and I put that in

13:34:54  25   there.

113

13:58:13    1    and the other examples you described before, are

2    there any other things that you experienced at work

3    that you believe was an adverse or unfavorable

4    personnel action taken against you because of the

13:58:28    5    protected acts you described before?

6         A    Jacob -- Jacob told me that Valeant does

7    all kinds of things to people and that he was there,

8    at least in part, for the blood sport, that he --

9         Q    You mean in terms of firing -- letting

13:58:51  10    people go --

11         A    Yes.

12         Q    -- after they acquired their companies?

13         A    Yes.  He absolutely loved the blood sport.

14    And he did that to try and intimidate and harass and

13:59:02  15    make -- and make me feel like I was -- that I was

16    nobody and that he was all powerful.

17         Q    And is it -- are you saying that it's your

18    interpretation that he did that to try to intimidate

19    and harass you?

13:59:18  20         A    That's the way that I felt, yes.

21         Q    And you testified earlier that you were

22    not part of Medicis, that you were hired by Valeant

23    after the Medicis acquisition; correct?

24         A    Yes.

13:59:31  25         Q    And so why did you have any reason to

133

14:44:09   1          Q      Go ahead.

          2          A      (No audible response.)

          3          Q      Do you recall -- and you previously

          4    testified, I believe, that you received

14:44:20   5    communication regarding your employment on

          6    August 5th; correct?

          7          A      Yes.

          8          Q      And that's when you had a meeting with

          9    Ms. Brunger; correct?

14:44:27  10          A      Yes.   I was told after I received this

         11    communication from Jacob -- Jacob called me up and

         12    told me that I was going to remain in Scottsdale --

         13    no, excuse me -- no, remain with the company, and he

         14    said that I was going to be on the relocation list

14:44:54  15    for New Jersey.

         16          THE REPORTER:   I'm sorry, "the wait location"?

         17          THE WITNESS:   "Relocation."

         18          THE REPORTER:   "Relocation," thank you.

         19          THE WITNESS:   He said that I was on the list to

14:44:58  20    relocate to New Jersey.

         21    BY MS. LINEHAN:

         22          Q      What else did you -- did you discuss

         23    anything else with Mr. Alao regarding --

         24          A      Yes.

14:45:04  25          Q      -- regarding the relocation?

                                                              **164**

15:38:25   1    need to take some time.

2         Q    So is it your --

3         A    A few days.

4         Q    I'm sorry.  Is it your recollection that

15:38:28   5    you started on or about the following Monday,

6    August 12th?

7         A    Somewhere in there.  Close to, yes.

8         Q    Okay.

9         A    I didn't take more than two or three days

15:38:37  10    in between Valeant and going and consulting for

11    DataShield.

12         Q    Okay.  And you -- you separated -- you

13    resigned from DataShield; correct?

14         A    I did.

15:39:20  15         Q    Okay.  And was that on or around

16    September 11th?

17         A    It was -- yes.

18         Q    And to DataShield you didn't provide any

19    advance notice of resignation?

15:39:37  20         A    I could not.

21         Q    You resigned the same day?

22         A    I could not.

23         Q    And shortly after resigning -- and why did

24    you resign from DataShield?

15:39:47  25         A    Because I was so emotionally distressed.

                                                          195

15:39:52  1        Q      From?

          2        A      From the termination at Valeant.   I had

          3    that along with subsequent -- I had four lesions on

          4    my brain at the time.   After I -- after I resigned

15:40:07  5    from Valeant, I went and had an MRI done.   I don't

          6    remember the date, but it was shortly after.

          7        Q      And prior to that MRI --

          8        A      And there was a lot of issues.

          9        Q      And prior to that MRI, when did you

15:40:22 10    have -- what -- when was your most recent MRI prior

         11    to your post-resignation MRI?

         12        A      It would have been right before being at

         13    Valeant or I may have had one while I was at

         14    Valeant.   I -- there's so many medical records that

15:40:42 15    I can't recall which one, but I know it was within

         16    six months for sure.

         17        Q      And so is it your testimony you resigned

         18    for a combination of medical reasons and because you

         19    were upset regarding being notified of your end date

15:40:58 20    at Valeant?

         21        A      Yes.

         22        Q      Okay.

         23        A      I -- I -- I believe that one and the other

         24    are very tightly connected.

15:41:08 25        Q      How so?   What do you mean they're

                                                                    196

Exhibit "B"

JEREMY JAMES MUIR - 10/21/2016

10:21:17 1    Q.    Do you have any understanding of what -- do you

10:21:20 2    have any understanding who he was employed by?

10:21:22 3    A.    I believe he was employed by Valeant

10:21:27 4    Pharmaceuticals.

10:21:27 5    Q.    And when you say Valeant Pharmaceuticals, do

10:21:31 6    you have any understanding if there is a distinction

10:21:34 7    between Valeant Pharmaceuticals NA or Valeant

10:21:39 8    Pharmaceuticals International?

10:21:39 9    A.    I don't.

10:21:41 10   Q.    And would that answer be the same through the

10:21:47 11   present day, do you know if there is any distinction?

10:21:49 12   A.    I don't.

10:21:50 13   Q.    And you are currently employed by Valeant

10:21:53 14   Pharmaceuticals?

10:21:53 15   A.    Yes.

10:21:54 16   Q.    And how long have you been employed by Valeant

10:21:56 17   Pharmaceuticals for?

10:21:57 18   A.    I have been employed by Valeant Pharmaceuticals

10:22:01 19   since, I believe, around either August or September of

10:22:07 20   two years ago, so 2014.

10:22:09 21   Q.    Okay.  And how did you go from Statera to

10:22:18 22   Valeant Pharmaceuticals?

10:22:19 23   A.    Subsequent to the completion of work at Medicis

10:22:24 24   around October of 2013, I returned to Statera to do some

10:22:32 25   internal work for them while they looked for another

Exhibit "C"

JERZY JANECZKO - 10/17/2016

| | | |
|---|---|---|
| 13:09:54 | 1 | Q. So can you name me a single Valeant |
| 13:09:59 | 2 | Pharmaceutical senior management who works in |
| 13:10:02 | 3 | Canada? |
| 13:10:04 | 4 | MS. LINEHAN: I am sorry. Can you |
| 13:10:05 | 5 | say it again? |
| 13:10:07 | 6 | BY MR. MEISELAS: |
| 13:10:07 | 7 | Q. Yeah. Can you name for me a single |
| 13:10:09 | 8 | Valeant Pharmaceutical executive, I used management |
| 13:10:12 | 9 | before, but I will say executive now, who works in |
| 13:10:19 | 10 | Canada? |
| 13:10:20 | 11 | MS. LINEHAN: Are you referring to |
| 13:10:22 | 12 | VPI or VPNA? |
| 13:10:25 | 13 | MR. MEISELAS: I am referring to -- |
| 13:10:26 | 14 | Q. Let well, me ask you this: Is the |
| 13:10:28 | 15 | CEO of Valeant Pharmaceuticals North America |
| 13:10:30 | 16 | different than the CEO of Valeant Pharmaceuticals |
| 13:10:30 | 17 | International? |
| 13:10:35 | 18 | A. As far as I know, it's the same |
| 13:10:38 | 19 | person same position. |
| 13:10:39 | 20 | BY MR. MEISELAS: |
| 13:10:40 | 21 | Q. Okay. What about the chief financial |
| 13:10:40 | 22 | officer; is it a different CFO for VPI as it is for |
| 13:10:46 | 23 | VPNA? |
| 13:10:48 | 24 | A. That I don't know. There is a CFO |
| 13:10:50 | 25 | based out of Canada. But I am not sure if it's for |

Exhibit "D"

## RE: Scottsdale AZ Transition

**From:**

"Hardgrove, Alison" <"/o=valeant/ou=first administrative group/cn=recipients/cn=alison.brunger">

**To:**

Joseph Weinberg <jweinberg@medicis.com>

**Date:**

Mon, 05 Aug 2013 19:22:03 +0000

Sorry- I have a quick meeting! How about we say 15 minutes?- 12:35?

**From:** Joseph Weinberg [mailto:JWeinberg@medicis.com]
**Sent:** Monday, August 05, 2013 3:19 PM
**To:** Hardgrove, Alison
**Subject:** Re: Scottsdale AZ Transition

Sure give me 5 mins & ill be there:)

**Joseph Weinberg**
*Converged Infrastructure Engineer*
Enterprise Architecture and Solutions Engineering
**Valeant Pharmaceuticals International**
7720 N. Dobson Road, Scottsdale AZ 85256
**Tel:** (480) 291-5558
**Cell:** (480) 721-0666

On Aug 5, 2013, at 12:14 PM, "Hardgrove, Alison" <Alison.hardgrove@valeant.com> wrote:

> Hi Joseph,
> Do you have time right now? I am in the Flagstaff Conf room. Otherwise, let me know what time might work.
>
> **From:** Joseph Weinberg [mailto:JWeinberg@medicis.com]
> **Sent:** Monday, August 05, 2013 1:48 PM
> **To:** Hardgrove, Alison
> **Subject:** Re: Scottsdale AZ Transition
>
> Thanks Alison. What time can you meet today?
>
> **Joseph Weinberg**
> *Converged Infrastructure Engineer*
> Enterprise Architecture and Solutions Engineering
> **Valeant Pharmaceuticals International**
> 7720 N. Dobson Road, Scottsdale AZ 85256
> **Tel:** (480) 291-5558
> **Cell:** (480) 721-0666
>
> On Aug 5, 2013, at 10:44 AM, "Hardgrove, Alison" <Alison.hardgrove@valeant.com> wrote:
>
> > Hi Joseph,

I am happy to discuss live today or tomorrow. I will walk you through the transition plan and severance package that has already been worked out by IT.

Thanks

Alison

---

**From:** Joseph Weinberg [mailto:JWeinberg@medicis.com]
**Sent:** Sunday, August 04, 2013 09:41 PM
**To:** Hardgrove, Alison
**Subject:** Scottsdale AZ Transition

Hi Alison,

I reviewed the email sent this evening from Medicis mgt and the prior notification of the relocation to New Jersey last week. Jacob Alao has briefly mentioned the possibility of a relocation package to New Jersey that would provide me job security and continuous employment with Valeant. Upon further review I have realized it will not be possible to relocate.

I suffer from Multiple Sclerosis. I am currently in recovery from a relapse with MS and regularly see 3 different specialists to help manage my disease. Barrows Neurological Institute is located here in Arizona and is known as one of the best treatment centers in the country for MS. I feel strongly that I need to remain in AZ in order to receive the best of medical attention should I become hospitalized or need immediate care. I've already experienced stress from the news of the Scottsdale office closure and am doing my best to maintain balance in order to prevent any further health issues connected to my medical condition. I feel it will be in my best interest and in the best interest of Valeant to be provided 3 months of severance pay with an end date of employment effective August 6th to give me closure from this ordeal. This will allow me to focus on my health in light of the recent stress the news of this looming transition has brought.

I look forward to discussing this tomorrow.

Respectfully,

Joseph

Joseph Weinberg
*Converged Infrastructure Engineer*
Enterprise Architecture and Solutions Engineering
Valeant Pharmaceuticals International
7720 N. Dobson Road, Scottsdale AZ 85256
Tel: (480) 291-5558
Cell: (480) 721-0666