# GERAGOS & GERAGOS

A PROFESSIONAL CORPORATION
LAWYERS
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411
TELEPHONE (213) 625-3900
FACSIMILE (213) 232-3255
GERAGOS@GERAGOS.COM

MARK J. GERAGOS     SBN 108325
BEN J. MEISELAS     SBN 277412
Attorneys for Plaintiff JOSEPH WEINBERG

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH WEINBERG, an individual; <br><br> Plaintiff, <br><br> vs. <br><br> VALEANT PHARMACEUTICALS INTERNATIONAL, a Delaware corporation; MEDICIS PHARMACEUTICAL CORPORATION, a Delaware corporation; OBAGI MEDICAL PRODUCTS, INC., a Delaware corporation; BAUSCH & LOMB INCORPORATED, a New York corporation; and DOES 1 through 50, inclusive; <br><br> Defendants. | **Case No.: 8:15-cv-01260-DOC-KES** <br><br> **DECLARATION OF JOSEPH WEINBERG** |

## DECLARATION OF JOSEPH WEINBERG

I, Joseph Weinberg, hereby declare as follows:

1. I have personal knowledge of the facts in this declaration and if called upon as a witness, I could and would testify thereto.

2. In May 2013, I began employment with Valeant Pharmaceuticals. My title was Senior Converged Infrastructure Engineer. My place of employment was Scottsdale, Arizona. I worked on a number of financial and infrastructure systems based in California, New Jersey, and Canada.

3. In June 2013, I had a personal interaction with Jacob Alao. In this interaction, Mr. Alao asked me into a utility room, next to a server room to talk with me alone. While in this utility room, Mr. Alao asked for access to local administrator accounts and service account in exchange for a significant amount of money. He indicated to me that he wanted to use the accounts to steal financial information from Valeant for Mongran Financials, a financial firm run by Mr. Alao. I declined to participate in Mr. Alao's illegal activity and left the room.

4. After this interaction in June 2013 with Mr. Alao, he began to take actions against me in retaliation for declining to provide him with this access. While Mr. Alao was not my supervisor, he often controlled the manner and direction of the work for my team. The retaliatory conduct began with isolation from Mr. Alao. While Mr. Alao was based in New Jersey, he often travelled to the Scottsdale location where I primarily worked. After I refused to assist Mr. Alao with his fraudulent and/or illegal activity, he began a pattern of isolation against me. He would position himself far away from my work station despite the fact that the office was mostly empty. Furthermore, he began to make outlandish promises to me, including that I was a possible candidate for relocation to New Jersey, when there appeared to be no basis for such promise.

5. Also in June 2013, Mr. Alao and I had a private conversation before a meeting in which indicated to me that he liked firing people for the "blood sport." In

the same conversation, Mr. Alao relayed a story to me regarding Valeant's acquisition of Medicis. The story insinuated that Valeant acquired Medicis after a tragic event occurred involving then-owner of Medicis, Jonah Shacknai. Mr. Alao's story further insinuated that Valeant was connected to the tragic event.

6. Also in June 2013, I was tasked with the Hyperion, a financial system, data migration. Mr. Alao recommended a course of action that presented a high risk of data loss. I voiced my objection to Mr. Alao, knowing that any loss of data to a financial system would be in violation of federal regulations. Before conducting the data migration, I took precautions to prevent any loss of data. As I was monitoring the migration, Mr. Alao logged into the server, took control of my session under my credentials, and caused the migration to fail. This caused a significant loss of data.

7. In July 2013, I made a formal verbal report to Steve Schiavone regarding the conversations I had with Mr. Alao and the conduct I observed regarding Mr. Alao. Mr. Schiavone indicated to me that Mr. Alao was a "menace" and, even though Mr. Schiavone was technically Mr. Alao's supervisor, Mr. Schiavone indicated that he was unable to control Mr. Alao. Mr. Schiavone also informed me that there was no plan to relocate any employees to New Jersey.

8. I worked for Valeant Pharmaceuticals until August 5, 2013. On August 4, 2013, I emailed Alison Hardgrove stating that I would be unable to be relocated to New Jersey, even though Mr. Schiavone stated that no relocations would be made. On August 5, 2013, I met with Ms. Hardgrove and she presented me with a severance package and separation agreement. I did not agree with the terms of the severance package and decided to not accept it. I left my position at Valeant on August 5, 2013 because I believed that I was about to be terminated in retaliation for reporting Mr. Alao's fraudulent and/or illegal activity and because the stress of working at Valeant with Mr. Alao's retaliatory conduct was causing severe emotional distress.

9. I was diagnosed with multiple sclerosis in 2009. I have experienced the following symptoms of multiple sclerosis: a decrease in cognitive abilities, severe

depression, numbness in the extremities, mood and behavioral problems, severe headaches, and severe diplopia.

10. I sought psychological treatment from Shelley Berger Dooley, a psychiatric nurse practitioner. I was treated by Ms. Dooley from April 2013 to October 2013. A true and correct copy of a letter from Ms. Dooley, dated January 28, 2014, is attached hereto as Exhibit "A."

11. I began to experience severe emotional distress in May 2013. My emotional distress became exacerbated because of the retaliatory acts undertaken by Mr. Alao. During my time at Valeant, I felt severe depression, severe headaches, and a decrease in cognitive abilities. By August 2013, I was almost completely unable to work because of the emotional distress caused by Mr. Alao's retaliatory acts.

12. After leaving Valeant, I attempted to work as an independent contractor for DataShield in August 2013. I was unable to complete my job duties and resigned after a few weeks.

13. From September 2013 to April 2014, I was unable to work because of the severe emotional distress and other complications from my multiple sclerosis. During this time, I was essentially incapacitated as a human being. I was unable to secure employment and unable to perform any employment that I would have been able to secure. I slept up to 14 hours per day. My wife became the sole decision maker and I was removed from all financial and familial decisions.

14. In October 2013, the decision was made to sell my family's home in Arizona to move in with my wife's parents in Utah. I did not participate in the decision making process for this move.

15. Between September 2013 and April 2014, symptoms from my multiple sclerosis also increased because I was unable to receive the proper medication while on the COBRA plan administered by Valeant. As a result, my symptoms worsened and I was forced to seek further serious treatment.

DECLARATION OF JOSEPH WEINBERG

16. Beginning in April 2014, I began to recover from the symptoms of my multiple sclerosis and my severe emotional distress. I began looking for new employment.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 14th day of November, 2016, in Los Angeles, California.

_____
JOSEPH WEINBERG

DECLARATION OF JOSEPH WEINBERG

Exhibit "A"

**Shelley Berger Dooley PC, PMHNP-BC**
**Psychiatric Nurse Practitioner**
11000 N Scottsdale Road, #163
Scottsdale, Arizona 85254
480 922-5440; Fax 480 922-5445

January 28, 2014
To Whom It May Concern:

I am writing this letter at the request of Joseph Weinberg. I treated Mr. Weinberg for Mood Disorder NOS from 4/3/13 - 10/23/13. He complained of "brain fog" secondary to Multiple Sclerosis, which he was diagnosed with in 2009. He reported that the disease was progressive and that he had developed a new brain lesion recently. He also complained of "mood and behavioral problems", consisting of anxiety with obsessive traits, mood instability, impulsiveness, rages, and spending sprees. He reported a history of job difficulties and dissatisfaction, having five positions in the past five years. At the time of his initial evaluation he was unhappy with his current job, citing co-worker conflicts, and was interviewing for yet another position.

Mood issues date back to early childhood with suicidal ideation and a failed attempt at age seven or eight. He tried to suffocate himself in a snow bank, but became too cold.

Family history is positive for Bi-polar and depression.

Mr. Weinberg was treated with Zoloft and Risperdal. He had some initial improvement which was not sustained. In September 2013 he became severely depressed, and suicidal with a plan, but no intent. He had multiple stressors, including job stress, finances, and family stress with a baby due in December. He has had difficulty in social and work situations, frequently misperceiving interactions with others in a negative way. He reported feeling overwhelmed with an inability to cope with any responsibility. As a result, he felt he had no other option but to quit his job. His plans were to move to Utah to be with family and find a new provider.

He was last seen by this provider on September 26, 2013.

In summary, Mr. Weinberg has been pleasant and cooperative and compliant with treatment, but unstable and evidently in significant emotional pain. Unfortunately, his long history of mood instability has been further complicated by the impact of Multiple Sclerosis. This has resulted in a failure to respond positively to treatment at this time with this provider.

Sincerely,

*Shelley Berger Dooley NP*

PLTF 00268