1
2
3
4
5
6
7

8          UNITED STATES DISTRICT COURT

9          CENTRAL DISTRICT OF CALIFORNIA

10

11   JOSEPH WEINBERG,                    Case No.  8:15-cv-01260-KES

12              Plaintiff,

13        v.                             ORDER GRANTING DEFENDANT'S
                                         MOTION FOR SUMMARY
14   VALEANT PHARMACEUTICALS             JUDGMENT
     INTERNATIONAL, et al.,
15
                Defendants.
16

17

18                              **I.**

19                   **PROCEDURAL HISTORY**

20        On August 6, 2015, Plaintiff Joseph Weinberg ("Plaintiff") filed his operative

21   Complaint against Valeant Pharmaceuticals International ("VPI") and others

22   alleging ten claims: (1) retaliation in violation of Labor Code § 1102.5(b),

23   (2) retaliation in violation of Labor Code § 1102.5(c), (3) disability discrimination

24   in violation of Government Code § 12940(a), (4) wrongful termination,

25   (5) constructive discharge in violation of public policy, (6) harassment in violation

26   of Government Code § 12940, (7) retaliation in violation of Government Code

27   § 12940, (8) failure to maintain environment free from harassment in violation of

28   Government Code § 12940, (9) intentional infliction of emotional distress ("IIED"),

1

1  and (10) negligent infliction of emotional distress ("NIED").[1]  (Dkt. 1.)

2      On November 4, 2015, the Court dismissed all defendants other than VPI.

3  (Dkt. 29.)  The Court also dismissed claims three through eight under California's

4  Fair Employment and Housing Act because Plaintiff failed to allege that "he was

5  either employed in California or that the discriminatory conduct occurred in

6  California."  (Id. at 8.[2])

7      On December 6, 2016, the parties filed a joint stipulation replacing VPI with

8  Defendant Valeant Pharmaceuticals North America, LLC ("Defendant" or

9  "Valeant").  (Dkt. 50.)

10      On June 23, 2017, Valeant moved for summary judgment on all remaining

11  claims.  (Dkt. 63.)  In support, Valeant filed a Statement of Undisputed Facts

12  ("SUF" at Dkt. 65) and supporting evidence, including excerpts from Plaintiff's

13  deposition (Dkt. 63-2 at 7-113).

14      On July 18, 2017, Plaintiff filed his opposition (Dkt. 66) along with a

15  Statement of Genuine Issues ("SGI" at Dkt. 66-1) and supporting evidence,

16  including a declaration by Plaintiff (Dkt. 66-2).

17      Valeant filed a reply on July 25, 2016.  (Dkt. 67.)  Valeant also filed

18  evidentiary objections to Plaintiff's declaration (Dkt. 69) and another declaration

19  filed by Plaintiff (Dkt. 68), as well as a "reconciliation" of Valeant's SUF with

20  Plaintiff's SGI (Dkt. 70).

21      For the reasons stated below, Valeant's motion is GRANTED.

22                                    **II.**

23                               **STANDARD**

24      Summary judgment is proper when a "movant shows that there is no genuine

25  dispute as to any material fact and the movant is entitled to judgment as a matter of

26  _____

27      [1] All statutory references are to the California code unless otherwise specified.

28      [2] All page citations are to the CM/ECF pagination.

1   law." Fed. R. Civ. P. 56(a).  "A party asserting that a fact cannot be or is genuinely
2   disputed must support the assertion by" citing to depositions, documents, affidavits,
3   or other materials.  Fed. R. Civ. P. 56(c)(1)(A).  A party also may show that such
4   materials "do not establish the absence or presence of a genuine dispute, or that an
5   adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ.
6   P. 56(c)(1)(B).  An issue is "genuine" only if there is sufficient evidence for a
7   reasonable fact-finder to find for the non-moving party.  Anderson v. Liberty Lobby,
8   Inc., 477 U.S. 242, 248–49 (1986). A fact is "material" if the fact may affect the
9   outcome of the case.  Id.  "In considering a motion for summary judgment, the court
10  may not weigh the evidence or make credibility determinations, and is required to
11  draw all inferences in a light most favorable to the non-moving party."  Freeman v.
12  Arpaio, 125 F.3d 732, 735 (9th Cir. 1997).

### III.

### EVIDENTIARY OBJECTIONS

15      As a preliminary matter, Defendant asserts numerous evidentiary objections.
16  "In motions for summary judgment with numerous objections, it is often unnecessary
17  and impractical for a court to methodically scrutinize each objection and give a full
18  analysis of each argument raised."  Doe v. Starbucks, Inc., No.08–0582, 2009 WL
19  5183773, at *1 (C.D. Cal. Dec. 18, 2009). This is especially true when, as here,
20  "many of the objections are boilerplate recitations of evidentiary principles or blanket
21  objections without analysis applied to specific items of evidence."  Id.  To the extent
22  that the Court relied on objected-to evidence, it relied only on admissible evidence
23  and, therefore, the objections are overruled.

### IV.

### UNDISPUTED FACTS

26      Valeant is a Delaware limited liability company headquartered in New
27  Jersey.  (SUF 2.)  Plaintiff started an information technology ("IT") job in Valeant's
28  Scottsdale, Arizona office on May 13, 2013.  (SUF 8; Dkt. 63-2 at 8 [Plaintiff's

3

1   Depo. at 19].)  His position was "senior converged infrastructure engineer."  (Dkt.

2   63-2 at 22 [Plaintiff's Depo. at 33].)  His job involved supporting Valeant's

3   computer infrastructure, such as platform storage, networking, and directory

4   services.  (Id. at 29 [id. at 41].)  One project involved doing a data migration using

5   Hyperion software.  (Id. at 37 [id. at 62].)

6        Plaintiff's "place of employment was Scottsdale, Arizona."  (Dkt. 66-2,

7   Weinberg Decl., ¶ 2.)  Plaintiff was neither a citizen nor resident of California

8   during his employment with Valeant.  (SUF 1.)  Plaintiff never travelled outside of

9   Arizona to work for Valeant.  (SUF 3.)

10       While at Valeant, Steve Schiavone supervised Plaintiff.  (Dkt. 66-2,

11  Weinberg Decl., ¶ 12.)  Jacob Alao was a Valeant IT employee based in New

12  Jersey.  (Id., ¶ 4; SUF 4.)  Sometimes he travelled to Valeant's Scottsdale office

13  and worked there with Plaintiff.  (SGI 4.)

14       Plaintiff contends[3] that while at Valeant, Mr. Alao asked Plaintiff to give him

15  local administrator and service account access credentials.  (Dkt. 63-2 at 35

16  [Plaintiff's Depo. at 60].)  Mr. Alao told Plaintiff that he wanted to use the

17  credentials to steal financial information from Valeant for use at his own Nigerian

18  financial firm, Mongran Financial.  (Id. at 36 [id. at 61]; Dkt. 66-2, Weinberg Decl.,

19  ¶ 3.)  Plaintiff refused to provide the requested credentials and complained verbally

20  to Mr. Schiavone,[4] after which Mr. Alao treated Plaintiff hostilely.  (Dkt. 63-2 at

21  _____

22  [3] While Valeant disputes Plaintiff's allegations concerning Mr. Alao's conduct, the Court accepts Plaintiff's version of events as true for purposes of

23  deciding Valeant's motion for summary judgment.

24  [4] Plaintiff initially testified that he reported Mr. Alao's access request verbally

25  to Valeant employee Craig Tinsely, saying that "he couldn't work for Jacob and here's the reason why."  (Dkt. 63-2 at 43-44 [Plaintiff's Depo. at 85-86].)  Sometime

26  later, Plaintiff sent an email to Mr. Tinsely complaining that Mr. Alao had sabotaged

27  a data migration project.  (Id. at 43 [id. at 85].)  That email did not mention Mr. Alao's

    earlier request for access credentials.  (Id.)  Plaintiff believes that Mr. Tinsley
28  included Mr. Alao "on emails about [Plaintiff's] complaint," such that Mr. Alao

                                      4

44, 50 [Plaintiff's Depo. at 86, 124]; Weinberg Decl., ¶ 4.)  Plaintiff's adverse treatment at Valeant was "limited to Mr. Alao."  (Dkt. 63-2 at 46 [Plaintiff's Depo. at 111].)

In late July and early August 2013, in connection with moving certain operations to Valeant's headquarters in New Jersey, Valeant's decision makers discussed which (if any) Scottsdale-based IT employees would be eligible to relocate to New Jersey and therefore be retained.  (SUF 11.)  Plaintiff recalled Mr. Schiavone saying on July 18, 2013, that Plaintiff should start looking for another job. (Dkt. 63-2 at 63 [Plaintiff's Depo. at 137].)

Plaintiff followed this advice and started looking for another position in Arizona.  He was a "highly recruited engineer and there were many people looking at [him]."  (Id. at 74-75 [id. at 173-74].)  After multiple interviews, he received an offer of employment from DataShield prior to his separation from Valeant.  (Id. at 74-73 [id. at 177-78].)

Near the end of July 2013, Plaintiff spoke with both Mr. Alao and Mr. Schiavone about the possibility of retaining his Valeant job by relocating to New Jersey.  (Id. at 68-70 [id. at 164-66].)  Plaintiff indicated that any relocation package would need to include a cost-of-living salary increase.  (Id.)

On Sunday, August 4, 2013, Plaintiff sent an email to Valeant employee Alison Hardgrove.  (Dkt. 66-2, Weinberg Decl., ¶ 8.)  The email stated as follows:

> I reviewed the email sent this evening from Medicis mgt and
> the prior notification of the relocation to New Jersey last week.  Jacob
> Alao has briefly mentioned the possibility of a relocation package to

---

became aware that Plaintiff had complained about the data migration.  (Id. at 45 [id. at 110].)  Later in his deposition, Plaintiff clarified that Mr. Tinsley was the person to whom he complained about the data migration "and Steve [Schiavone] was on the other portion," i.e., the person to whom he complained about Mr. Alao's request for access credentials.  (Id. at 111-12 [id. at 266-67].)

5

1   New Jersey that would provide me job security and continuous
2   employment with Valeant.  Upon further review I have realized it will
3   not be possible to relocate.

4        I suffer from Multiple Sclerosis.  I am currently in recovery
5   from a relapse with MS and regularly see 3 different specialists to
6   help manage my disease.  Barrows Neurological Institute is located
7   here in Arizona and is known as one of the best treatment centers in
8   the country for MS.  I feel strongly that I need to remain in AZ in
9   order to receive the best of medical attention should I become
10  hospitalized or need immediate care.  I've already experienced stress
11  from the news of the Scottsdale office closure and am doing my best
12  to maintain balance in order to prevent any further health issues
13  connected to my medical condition.  I feel it will be in my best
14  interest and in the best interest of Valeant to be provided 3 months of
15  severance pay with an end date of employment effective August 6th to
16  give me closure from this ordeal.  This will allow me to focus on my
17  health in light of the recent stress the news of this looming transition
18  has brought.

19        I look forward to discussing this tomorrow.
20  (Dkt. 63-2 at 132.)

21        On Monday, August 5, 2013, Valeant offered Plaintiff a severance package.
22  (SUF 14; see Dkt. 63-2 at 159-165.)  The severance package would have permitted
23  Plaintiff to continue working in Arizona until October 2013 and to take some
24  unpaid medical leave.  (Dkt. 63-2 at 48 [Plaintiff's Depo. at 122].)  Plaintiff
25  reviewed the severance package and understood "in order for me to get severance, I
26  had to sign away my rights."  (Id. at 156 [id. at 182].)  In response to this offer,
27  Plaintiff sent Mr. Schiavone an email with the subject line "Notice of Resignation"
28  that stated as follows:

6

1     This notice is to inform you that today August 5th, 2013, is my
2     last day at Valeant Pharmaceuticals.  HR present me with a packet for
3     severance and I do not agree with the terms set.
4         Thank you.
5  (Dkt. 63-2 at 171.)  After sending this email, Plaintiff turned off his computer and
6  left Valeant's office.  (Dkt. 63-2 at 83 [Plaintiff's Depo. at 191].)  Plaintiff did not
7  return to work at Valeant after Monday, August 5, 2013.  (SUF 18.)  After his
8  separation, he elected to continue receiving health insurance through COBRA.
9  (Dkt. 63-2 at 66 [Plaintiff's Depo. at 147].)
10        The following week, on approximately Monday, August 12, 2013, Plaintiff
11 started his new position at DataShield.  (Id. at 84-85 [id. at 194-95].)  Plaintiff
12 testified that for the "first three weeks after Valeant" he was "unable to go to work
13 at DataShield."  (Id. at 105 [id. at 243].)  He also testified, however, that at some
14 point he provided services to DataShield in exchange for compensation.  (Id. at 76
15 [id. at 175].)  He resigned from DataShield on September 11, 2013, by sending an
16 email.  (Id. at 85 [id. at 195].)  The email stated, "Today 9/11/13 was my last day
17 working at Datashield.  This email is a notice of my resignation."  (Dkt. 63-2 at
18 178.)  He made the decision to resign after concluding he was "unable to complete
19 [his] job duties" and obtaining "advice and counsel" from his wife.  (Dkt. 66-2,
20 Weinberg Decl., ¶ 12.)
21        At his deposition, Plaintiff described having difficulty working during the
22 entire period between June 2013 through April 2014, testifying that he "could go to
23 work and … gut it out for eight hours, but when [he] would go home, on a daily
24 basis [he] would immediately have to go and lay down."  (Dkt. 63-2 at 108
25 [Plaintiff's Depo. at 249].)
26        After separating from DataShield, Plaintiff and his wife moved to Utah in
27 November 2013 to live temporarily with her parents.  (Id. at 87 [id. at 203].)  Plaintiff
28 and his wife were expecting a baby who was born in late 2013.  (Id. at 65 [id. at 139].)

While in Utah, Plaintiff applied for social security disability benefits; his wife helped with the application, but he "did a good part of it." (Id. at 87 [id. at 203].) After his application was denied in March or April of 2014, Plaintiff met with an attorney in St. George, Utah, and he filed an appeal through the attorney. (Id. at 88 [id. at 204].)

In June 2014, Plaintiff obtained a full-time job as a computer infrastructure architect at the Cosmopolitan hotel in Las Vegas, causing him to terminate his disability benefits appeal. (Id. at 88-89 [id. at 205-06].) He worked at the Cosmopolitan through approximately May 2015, earning a base salary of about $100,000 per year. (Id. at 92 [id. at 208].) Plaintiff retained his current counsel, Geragos & Geragos, in March 2015 to advise him concerning his employment at the Cosmopolitan. (Id. at 95 [id. at 214].) He eventually separated from the Cosmopolitan pursuant to a confidential settlement. (Id.)

**V.**

**DISCUSSION**

**A.**    **Plaintiff's Labor Code Retaliation Claims Fail as a Matter of Law.**

      **1.**    **Statutory Language.**

In 2013 when Plaintiff was working for Valeant, Labor Code section 1102.5 subparts (b) and (c) provided as follows:

> (b) An employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation.

> (c) An employer may not retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation.

8

1  Cal. Lab. Code § 1102.5(b)-(c) (West 2013).

2      **2.      The California Labor Code Does Not Apply to Arizonans Working**

3           **in Arizona for a New Jersey Employer.**

4      Plaintiff argues that he can sue Valeant under the California Labor Code

5  "because of the direct effects that Plaintiff's work had on California and California

6  locations," i.e., his work affected "California servers and databases." (Dkt. 66 at

7  17-18.) While at Valeant, Plaintiff "worked on a number of financial and

8  infrastructure systems based in California, New Jersey, and Canada." (Dkt. 66-2,

9  Weinberg Decl., ¶ 2.) This is the only evidence of Plaintiff's work having any

10 connection to California.

11          a.      The Labor Code's Applicability Depends on California's

12                 Interest in Regulating the Employment Relationship at Issue.

13     California must have a "significant contact or significant aggregation of

14 contacts" to any claim asserted under California law to ensure that the choice of

15 California law "is not arbitrary." Phillips Petroleum Co. v. Shutts, 472 U.S. 797,

16 821-22 (1985) (citation omitted). Applying any state's law to claims "unrelated to

17 that State … is sufficiently arbitrary and unfair as to exceed constitutional limits."

18 Id. (holding it would be unconstitutional to apply Kansas law to class members

19 from all 50 states).

20     To avoid such constitutional problems, there is a presumption against the

21 extraterritorial application of state laws. Sullivan v. Oracle, 51 Cal. 4th 1191, 1207

22 (2011). In Sullivan, the California Supreme Court held – as a matter of statutory

23 construction and after a conflict-of-law analysis under the "governmental interest"

24 test – that the California Labor Code's overtime compensation statutes applied to

25 work performed in California by nonresident employees of a California-based

26 company, "in the circumstances of [that] case."[5] Id. at 1206. The Sullivan

27 _____

28      [5] Sullivan was decided as a question certified by the Ninth Circuit. See
   Sullivan v. Oracle Corp., 662 F.3d 1265, 1270 (9th Cir. 2011) (explaining procedural

1    plaintiffs were "instructors" who trained customers in the use of Oracle's software

2    products.  Two lived in Colorado and one lived in Arizona.  Id. at 1195.  Over the

3    four-year period relevant to the lawsuit, one worked 74 days in California, one

4    worked 110 days, and the third worked 20 days.  Id.

5         The California Supreme Court first considered the language of the relevant

6    California statutes and determined that no express terms precluded their application

7    to non-residents.  Id. at 1197.  The court next performed a three-step conflict-of-law

8    analysis considering the (1) differences between potentially applicable state laws,

9    (2) each state's interest in applying its own law, and (3) "which state's interest

10   would be more impaired if its policy were subordinated to the policy of the other

11   state."  Id. at 1202-03.  While California's overtime laws differed from the laws of

12   plaintiffs' home states, the court found that the existence of a true conflict was

13   "doubtful, at best," because California has a "strong interest in applying its

14   overtime law … to all work performed within its borders."  Id. at 1203.  The court

15   further determined that any interest Colorado and Arizona might have in providing

16   hospitable regulatory environments for their own businesses was not "perceptibly

17   impaired by requiring a California employer to comply with California overtime

18   law for work performed here" in California.  Id. at 1206.

19        Several subsequent decisions have applied Sullivan when considering what

20   level of California contacts are needed to create a cause of action under the

21   California Labor Code.  See, e.g., Vidrio v. United Airlines, Inc., No. 15-7985,

22   2017 WL 1034200 (C.D. Cal. Mar. 15, 2017) (discussing multiple flight attendant

23   cases and determining that the factors relevant to analyzing the Labor Code's

24   applicability are (1) the employer's citizenship, and (2) the employee's state of

25   residence and (3) whether/how much the employee worked in California); Shook v.

26   Indian River Transport Co., No. 14-1415, 2017 WL 633895 (E.D. Cal. Dec. 15,

27   _____

28   history).

10

2017) (ruling after a bench trial that even though plaintiffs working for a Florida-based trucking company were California residents, California's wage and rest break laws do not apply to work outside California); <u>Campagna v. Language Line Servs., Inc.</u>, No. 08-2488, 2012 WL 1565229 (N.D. Cal. May 2, 2012) (holding plaintiff did not have a claim under Labor Code section 2802 against her California employer for failing to pay the job-related "necessary expenses" of a home phone line and Internet access where plaintiff worked at home in Iowa).

In <u>Maez v. Chevron Texaco Corp.</u>, No. 04-790, 2005 WL 1656908 (N.D. Cal. July 13, 2005), the district court denied defendant summary judgment on the issue of whether plaintiff was subject to California's wage and hour laws. The plaintiff's employer had relocated him to Arizona to avoid the high cost of living in California, but his entire customer base remained in California and his entire job was to generate sales in California. He also travelled to California several times a month for business.

In <u>Leibman v. Prupes</u>, No. 14-9003, No. 14-9003, 2015 WL 3823954 (June 18, 2015), the district court found that the presumption against extraterritoriality applies to Labor Code section 1102.5, but that the statute is not being applied extraterritorially if the employer's decision to retaliate occurred in California.

b.      Analysis.

Nothing in the language of Labor Code section 1102.5 indicates that the California Legislature meant for it to apply extraterritorially, such that the "presumption against extraterritoriality applies to [Section 1102.5] in full force." <u>Sullivan</u>, 51 Cal. 4th at 1207.

The application urged by Plaintiff would be extraterritorial. It is undisputed that while working for Valeant, Plaintiff never lived in California or travelled to California for business. It is also undisputed that all of Mr. Alao's interactions with Plaintiff occurred in Arizona, and that he typically worked in New Jersey. Plaintiff does not allege that any retaliatory decision-making occurred in California. The

*only* connection between Plaintiff's work and California is that some unspecified portion of his time involved remotely accessing and working with data stored on computer infrastructure located in California.

Plaintiff fails to cite a single case holding (or even suggesting by analogy) that this kind of tenuous cyber connection is sufficient to rebut the presumption against the extraterritorial application of California law.  Per the above-cited authorities, it is not.  California has no interest in applying its labor laws to employers or employees who may interact with California computer servers absent a showing that such interactions affected California residents or businesses in some way worthy of regulating – and Plaintiff has made no such showing here.  In contrast, Arizona has a strong interest in defining what workplace conduct is unlawful in Arizona workplaces.  To allow Plaintiff to assert California Labor Code claims against Valeant under the undisputed facts of this case would be so unpredictable to Valeant and so arbitrary as to violate the Due Process Clause.  Phillips Petroleum Co., 472 U.S. at 821-22.  Plaintiff does not have a cause of action under California Labor Code section 1102.5.

### 3.    Plaintiff's Claim Also Does Not Satisfy Subpart (b).

In 2013, Labor Code section 1102.5(b) prohibited retaliation for "disclosing information to a government or law enforcement agency."  Plaintiff admits that he never disclosed information about Valeant to any government or law enforcement agency.  (SUF 7.)  This provides a separate and independent reason why Plaintiff's claim under section 1102.5(b) fails.

Effective January 1, 2014, the California Legislature amended section 1102.5(b) to no longer require external reporting.  2013 Cal. Legis. Serv. Ch. 577 (S.B. 666) (West).  Even though this amendment occurred after Plaintiff left Valeant, he argues that the amended version of the statute "should apply retroactively" because of strong public policy reasons to protect whistleblowers from retaliation.  (Dkt. 66 at 19-20.)

12

California statutes apply prospectively unless the Legislature expressly indicates otherwise.  Californians For Disability Rights v. Mervyn's, LLC, 39 Cal. 4th 223, 230 (2006).  Courts have found no such indication in Labor Code section 1120.5.  In Medlock v. Fred Finch Children's Home, No. 14-3000, 2014 WL 4756055, at *8 (N.D. Cal. Sept. 24, 2014), the district court explained as follows:

> Under California law, as under federal law, statutes do not operate retrospectively unless the legislature plainly intended them to do so. Valles v. Ivy Hill Corp., 410 F.3d 1071, 1079 (9th Cir. 2005) (citing Evangelatos v. Superior Court, 44 Cal. 3d 1188 … (1988)).  The Court finds no indication of such intent here [as to section 1102.5(b)], and concludes that the amendment to protect internal reporting does not apply retrospectively and thus does not govern [plaintiff's] termination in 2009.

Id.  Similarly, in Tobin v. City & County of San Francisco Police Dep't, No. 13-1504, 2015 WL 1885632, at *4 (N.D. Cal. Apr. 24, 2015), the district court ruled as follows:

> As a preliminary matter, although the California Legislature amended section 1102.5(b) in 2014 to include violations of local rules and regulations, see Cal. Lab. Code § 1102.5(b), this amendment does not apply retroactively.  It is a "well-established presumption [that] statutes apply prospectively in the absence of a clearly expressed contrary intent ...."  Californians for Disability Rights v. Mervyn's LLC, 39 Cal. 4th 223, 230 … (2006).  This presumption applies to the California Labor Code.  Aetna Casualty & Surety Co. v. Industrial Acci. Com., 30 Cal. 2d 388, 395 … (1947).  Therefore, as Plaintiff's allegations all occurred before 2014, the Court finds that the recent amendment incorporating disclosure of violations of local laws does not apply to this case.  See Ferrick v. Santa Clara Univ., 231 Cal. App.

13

1   4th 1337, 1344 … (2014) (applying version of section 1102.5 relevant

2   to time period of allegations in that case).

3   Id.

4       Although the court in <u>Tobin</u> addressed the portion of the amendment

5   broadening the language to include state in addition to federal laws, the same

6   principle applies to the portion of the amendment broadening the language to include

7   internal disclosures.  <u>See also</u> <u>Robles v. Agreserves, Inc.</u>, 158 F. Supp. 3d 952, 1008

8   (E.D. Cal. 2016) (granting summary judgment of plaintiff's claim under section

9   1102.5(b), stating: "[u]nder the 2013 version of § 1102.5, only complaints or reports

10  made to a governmental agency are protected; complaints or reports made 'internally'

11  to the employer are not protected.  [Citations.]  Because [the plaintiff] did not report

12  his suspicions to a governmental agency, he did not engage in protected activity for

13  purposes of § 1102.5(b).").

14      Here, Plaintiff undisputedly did not report his interactions with Mr. Alao to

15  any government or law enforcement agency, such that section 1102.5(b) does not

16  apply to his retaliation claim.

17  **B.**  **<u>Plaintiff's IIED and NIED Claims Fail as a Matter of Law.</u>**

18      **1.**  **Conflict-of-Law Analysis.**

19      Before analyzing Plaintiff's IIED and NIED claims, this Court must

20  determine whether Plaintiff's claims sound in California or Arizona law.[6]  In

21  diversity cases, such as this one, federal courts apply the conflict-of-law principles

22  of the forum state.  <u>Haisten v. Grass Valley Med. Reimbursement Fund, Ltd.</u>, 784

23  F.2d 1392, 1402 (9th Cir. 1986).  California resolves conflict-of-law questions

24  using the three-step "governmental interest" test, as follows:

25          First, the court determines whether the relevant law of each of

26  the potentially affected jurisdictions with regard to the particular issue

27  

28        [6] The parties' briefing assumes California law applies, without analysis.

14

1  in question is the same or different.

2      Second, if there is a difference, the court examines each

3  jurisdiction's interest in the application of its own law under the

4  circumstances of the particular case to determine whether a true

5  conflict exists.

6      Third, if the court finds that there is a true conflict, it carefully

7  evaluates and compares the nature and strength of the interest of each

8  jurisdiction in the application of its own law to determine which

9  state's interest would be more impaired if its policy were subordinated

10  to the policy of the other state, and then ultimately applies the law of

11  the state whose interest would be more impaired if its law were not

12  applied.

13  Mazza v. Am. Honda Motor Co., 666 F.3d 581, 590 (9th Cir. 2012) (citing McCann

14  v. Foster Wheeler LLC, 48 Cal. 4th 68, 81-82 (2010)).

15          a.  IIED and NIED Elements.

16  Under Arizona law, the elements of IIED are as follows:

17      [F]irst, the conduct by the defendant must be "extreme" and

18  "outrageous"; second, the defendant must either intend to cause

19  emotional distress or recklessly disregard the near certainty that such

20  distress will result from his conduct; and third, severe emotional

21  distress must indeed occur as a result of defendant's conduct.

22  Ford v. Revlon, Inc., 153 Ariz. 38, 43 (1987) (citing Restatement (Second) of Torts

23  § 46 (1965)).  California defines this tort the same way.  Cochran v. Cochran, 65

24  Cal. App. 4th 488, 494 (1998) (also citing Restatement (Second) of Torts § 46).

25      In Arizona, three elements are necessary to establish the tort of NIED: (1) the

26  defendant unintentionally causes emotional distress to another that results in illness

27  or bodily harm; (2) the defendant should have realized that his conduct involved an

28  unreasonable risk of causing such emotional distress, otherwise than by knowledge

15

of the harm or peril of a third person; and (3) the defendant, from facts known to him, should have realized that the distress, if it were caused, might result in illness or bodily harm.  Keck v. Jackson, 122 Ariz. 114, 115 (1979) (citing Restatement (Second) of Torts § 313).  Thus, "the shock or mental anguish of the plaintiff must be manifested as a physical injury."  Id. (citing the Restatement ["If the actor's conduct is negligent as creating an unreasonable risk of causing either bodily harm or emotional disturbance to another, and it results in such emotional disturbance alone, without bodily harm or other compensable damage, the actor is not liable for such emotional disturbance."]).

California does not recognize NIED as an independent tort.  Rather, it is merely a type of negligence, such that "a plaintiff pleading NIED must allege facts showing duty, breach of duty, causation, and damages."  Burgess v. Superior Court, 2 Cal. 4th 1064, 1072 (1992).  In California, damages for negligently inflicted emotional distress may be recovered in the absence of physical injury.  Wooden v. Raveling, 61 Cal. App. 4th 1035, 1043 (1998).

Here, Plaintiff testified at his deposition that he suffered physical symptoms caused by emotional distress, including numbness of his appendages, brain lesions, pain, and impotence.  (Dkt. 63-2 at 105-07 [Plaintiff's Depo. at 243-46].)  He specifically testified that the numbness and pain were "part of [his] time at Valeant."  (Id. at 105 [id. at 243].)  Thus, while California and Arizona NIED laws are different in that Arizona requires physical symptoms while California does not, that difference is not material in this case.

b.  Statutes of Limitations and Tolling Laws.

Federal courts addressing state law claims must apply state laws governing limitations periods, accrual, and tolling.  Centaur Classic Convertible Arbitrage Fund Ltd. v. Countrywide Fin. Corp., 878 F. Supp. 2d 1009, 1015 (C.D. Cal. 2011).  Under both California and Arizona law, the statute of limitations for IIED and NIED claims is two years.  Miller v. Bank of Am., Nat'l Ass'n, 858 F. Supp. 2d

16

1  1118, 1127 (S.D. Cal. 2012) (citing Code Civ. Proc. § 335.1); <u>Hansen v. Stoll</u>, 130

2  Ariz. 454, 460 (Ct. App. 1981) (citing Ariz. Rev. Stat. Ann. § 12-452).

3       There is no also difference between when an IIED or NIED claim accrues

4  under California or Arizona law.  Generally, a cause of action accrues when every

5  element of the cause of action exists.  <u>Howard Jarvis Taxpayers Ass'n v. City of La</u>

6  <u>Habra</u>, 25 Cal. 4th 809, 815 (2001), as modified (Jul. 18, 2001) ("[A] cause of

7  action accrues and the statute of limitations begins to run when a suit may be

8  maintained …").  For torts based on the infliction of emotional distress, the cause

9  of action accrues when the plaintiff experiences the distress-inflicting conduct and

10  is thereby injured.  <u>Campanano v. Cal. Med. Ctr.</u>, 38 Cal. App. 4th 1322, 1325

11  (1995); <u>Cecala v. Newman</u>, 532 F. Supp. 2d 1118, 1143 (D. Ariz. 2007).

12       Both Arizona and California also provide tolling for severe mental

13  impairment.  Such tolling statutes are based on equitable principles; it may be

14  unfair to apply the limitations period strictly to plaintiffs unable to appreciate or

15  protect their legal rights.  Arizona provides tolling for those of "unsound mind"

16  when the cause of action accrued.  Ariz. Rev. Stat. Ann. § 12-502.  Unsound mind

17  means that the "person is unable to manage his affairs or to understand his legal

18  rights or liabilities." <u>Doe v. Roe</u>, 191 Ariz. 313, 325 (1998).

19       In 2013, California law provided tolling for persons who were "insane" when

20  the cause of action accrued.  Cal. Code Civ. Proc. § 352(a).  A person is "insane" if

21  he suffers from "a condition of mental derangement which renders the sufferer

22  incapable of caring for his property or transacting business, or understanding the

23  nature or effects of his acts." <u>Cole v. Fair Oaks Fire Protection 8 Dist.</u>, 43 Cal. 3d

24  148, 155 n.7 (1987).  The Court sees no material distinction between Arizona's

25  definition of "unsound mind" and California's definition of "insanity" for purposes

26  of tolling.

27       Having found no material difference between California and Arizona law, the

28  Court ends its conflict-of-law analysis at step one and applies California law to

17

1  adjudicate Defendant's motion for summary judgment on Plaintiff's IIED and
2  NIED claims.

3                                  c.  Workers' Compensation Exclusivity.

4         In both California and Arizona, a state Workers' Compensation Act provides
5  the exclusive remedy for workplace injuries.  Cal. Lab. Code § 3601(a); Ariz. Rev.
6  Stat. Ann. §§ 23-906, 23-1022(A).

7         Under California law, both IIED and NIED claims are potentially barred by
8  workers' compensation exclusivity.  <u>Winter v. Corr. Corp. of Am.</u>, No. 08-1717,
9  2009 WL 1796309, at *6 (S.D. Cal. June 24, 2009) ("The workers' compensation
10 exclusivity rule applies to both IIED and NIED claims.").  For purposes of applying
11 the exclusivity bar, the relevant question is not whether the employer's conduct was
12 willful, but instead whether the employer's conduct "exceeds the risks inherent in
13 the employment relationship."  <u>Grotz v. Kaiser Found. Hosps.</u>, No. 12-3539, 2012
14 WL 5350254, at *10 (N.D. Cal. Oct. 29, 2012).  If so, then the exclusivity bar
15 applies.

16        Arizona, in contrast, recognizes "a willful misconduct exception."
17 <u>Eichenberger v. Falcon Air Exp. Inc.</u>, No. 14-168, 2014 WL 3819355, at *5 (D.
18 Ariz. Aug. 4, 2014).  This exception applies when the employee's injury is caused
19 by the employer's "willful misconduct," which is defined as "an act knowingly and
20 purposely with the direct object of injuring another."  <u>Id.</u>, citing Ariz. Rev. Stat.
21 Ann. §§ 23-1022(A), 23-1022(B).  By definition, IIED claims fall within this
22 exception, but NIED claims – which are based on negligence – do not.  <u>Id.</u>

23        Here, Defendant has only moved for summary judgment on Plaintiff's NIED
24 claim based on the workers' compensation exclusivity bar.  (Dkt. 63-1 at 28.)
25 Because California and Arizona law are different, the Court will analyze
26 Defendant's motion under both California and Arizona law.

27       **2.**        **Plaintiff's IIED and NIED Claims are Time-Barred.**

28        It is undisputed that Plaintiff last worked at Valeant on August 5, 2013,

making that the latest possible accrual date for his IIED or NIED claim.  His limitations period, absent tolling, expired two years later on Wednesday, August 5, 2015.  Plaintiff did not file the instant lawsuit until one day later on August 6, 2015.  (Dkt. 1.)

Plaintiff contends that there is a triable issue of fact as to whether he was insane when his claim accrued (i.e., on August 5, 2013, or sometime earlier during his employment with Valeant[7]) such that he qualifies for insanity-based tolling under Code of Civil Procedure section 352(a).  (Dkt. 66 at 11.)

a.  Undisputed Facts Showing Plaintiff's Mental State.

Because insanity is not a condition that exists one day and is gone the next, and because Plaintiff alleges that a series of events during his employment emotionally injured him, the Court considers evidence of Plaintiff's mental state from the beginning of his work at Valeant through September 2013.

Prior to working at Valeant, Plaintiff worked for International Cruise & Excursions ("ICE").  (Dkt. 63-2 at 9 [Plaintiff's Depo., 20:6-17].)  He was recruited by Valeant, and there was no significant gap between his jobs at ICE and Valeant.  (Id.)

Plaintiff only worked at Valeant from May 13, 2013, through August 5, 2013, approximately 85 days.  Once hired by Valeant, there is no evidence that Plaintiff failed to attend work regularly or perform his job duties.  During his employment, he discussed potentially relocating to Valeant's New Jersey office, requesting a raise if he did so, and he also interviewed for several new jobs that would permit him to stay in Arizona.  In July 2013, he successfully interviewed with and obtained a job offer from DataShield.

---

[7] Plaintiff declares he "began to experience severe emotional distress in June 2013," and that his distress was later exacerbated by Mr. Alao's mistreating him.  He further declares that while at Valeant, his emotional distress caused the physical symptom of "severe headaches."  (Dkt. 66-2, Weinberg Decl., ¶ 11.)

On August 4, 2013, Plaintiff wrote and sent an email cogently discussing why he did not want to relocate to New Jersey and requesting a severance package. In response, Valeant offered him a severance package that would have permitted him to continue working through October 2013.  He declined, knowing that he already had a job offer from DataShield.  Upon separating from Valeant, Plaintiff successfully signed up for COBRA health insurance.

While there is some dispute about how much work Plaintiff performed for DataShield, there is no dispute, per his own deposition testimony, that he provided services to DataShield in exchange for compensation.[8]  He did not resign from DataShield until four weeks after he started.  At that time, he had sufficient cognitive ability to consult with his wife concerning his decision to resign and send

---

[8] Plaintiff declares, "Within a day or two [of starting at DataShield], I realized that I was unable to complete my job duties.  On the advice and counsel of my wife, I resigned shortly thereafter." (Dkt. 66-2, Weinberg Decl., ¶ 12.)  He further declares that from August 2013 to April 2014, i.e., a time period encompassing his entire employment at DataShield, he was "unable to work …" and his "wife became the sole decision maker and [he] was removed from all financial and familial decisions." (Id., ¶ 13.)  At his deposition, however, he testified that Valeant terminated him, suggesting he was willing and able to work after his separation date. (Dkt. 63-2 at 86 [Plaintiff's Depo., at 198].)  He also testified that he started at DataShield on approximately August 11, 2013, provided services to DataShield in exchange for compensation, and sent a resignation email on September 11, 2013. (Id. at 76, 84-85 [id. at 175, 194-95].)  This deposition testimony is inconsistent with Plaintiff's declaration that he was unable to perform any work for DataShield and resigned "shortly" after "a day or two" of his starting date.  Plaintiff's deposition testimony that between August 2013 and April 2014 he exchanged emails with Valeant negotiating the terms of his separation, sent DataShield a resignation email, applied for COBRA benefits, and applied for disability benefits contradicts his assertion that he played no role in financial decisions. (Id. at 66, 86 [id. at 147, 198].)

"The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." Van Asdale v. Int'l Game Tech., 577 F.3d 989, 999 (9th Cir. Aug. 13, 2009).  This Court, therefore, disregards the portions of Plaintiff's declaration that contradict his deposition testimony.

1    an e-mail.

2          The evidence includes a January 2014 opinion letter from Psychiatric Nurse

3    Practitioner Shelly Berger Dooley who treated Plaintiff for "mood disorder" while

4    he was employed at ICE and continuing through September 2013, around when he

5    moved to Utah.  (Dkt. 63-2 at 117; Dkt. 63-2 at 13 [Plaintiff's Depo., 24:4-18].)

6    Nurse Dooley noted that during their sessions, Plaintiff reported a variety of

7    negative feelings, including anxiety, rage, job dissatisfaction, suicidal ideation, and

8    depression.  (Id. at 117.)  Despite these feelings, Nurse Dooley observed that

9    Plaintiff had been "pleasant and cooperative and compliant with treatment …."  (Id.

10   at 117.)  She did not include in her letter any opinion that Plaintiff was incapable of

11   managing his affairs while she was treating him.

12                 b.  Case law Applying Code of Civil Procedure section 352(a).

13          When the material facts are undisputed, the issue of whether a plaintiff

14   qualifies for insanity-based tolling may be decided by or before summary judgment.

15   See Quan v. Smithkline Beecham Corp., 149 F. App'x 668, 670 (9th Cir. 2005)

16   (where Ninth Circuit affirmed the district court's determination at the pleading

17   stage that plaintiff was not entitled to insanity-based tolling, court records subject to

18   judicial notice established that plaintiff had hired a lawyer and filed an employment

19   discrimination action during the relevant time); see also Funtanilla v. Rubles, No.

20   99-5425, 2003 WL 21309491, at *4 (N.D. Cal. June 3, 2003) (listing plaintiff's

21   court filings and denying additional discovery to supporting tolling defense to

22   summary judgment, because this "kind of litigation activity is wholly incompatible

23   with the notion that Funtanilla suffered 'insanity' that would toll the limitations

24   period"); compare Alcott Rehab. Hosp. v. Superior Court, 93 Cal. App. 4th 94, 96-

25   97 (2001) (holding that 70-year-old woman who suffered a stroke that left her

26   "disoriented," without "the intellectual ability to comprehend what was occurring

27   around her or to make decisions, unable to speak or perform tasks such as

28   "dressing, feeding, and personal hygiene" without assistance qualified for insanity-

1   based tolling); <u>Feeley v. Southern Pacific Transportation Co.</u>, 234 Cal. App. 3d

2   949, 951-952 (2011) (tolling action while plaintiff was comatose due to injuries he

3   received on defendant's premises).

4                    c.   Analysis.

5          Sufficient facts concerning Plaintiff's activities before and around August 5,

6   2013 are undisputed, allowing the Court to conclude that Plaintiff was not "insane"

7   when his IIED and NIED causes of action against Valeant accrued.  Plaintiff's

8   undisputed activities such as working at Valeant, procuring an offer to continue

9   working there until October 2013, successfully interviewing with DataShield,

10  negotiating over potential relocation and severance terms, writing cogent emails,

11  and obtaining COBRA insurance demonstrate that Plaintiff had sufficient mental

12  abilities to appreciate and protect his legal rights.

13         As evidence that he was so mentally deranged he was not capable of

14  managing his own affairs or understanding his own actions, Plaintiff offers his own

15  declaration testimony.  (<u>See</u> Dkt. 66-2, Weinberg Decl., ¶¶ 11-13.)  Some of that

16  testimony can be disregarded as contrary to Plaintiff's earlier deposition testimony.

17  (<u>See</u> note 8, above.)  The remainder is insufficient to show the existence of a

18  material, factual dispute.  <u>Anderson</u>, 477 U.S. at 252 ("The mere existence of a

19  scintilla of evidence in support of the [non-movant's] position will be insufficient;

20  there must be evidence on which the jury … could find by a preponderance of the

21  evidence" for the non-movant.)  Plaintiff's testimony that he slept "up to 14 hours

22  per day" and that he "did not participate in the decision-making process" for his

23  family's move to Utah is not evidence from which a jury could find that Plaintiff

24  was "insane" when his cause of action against Valeant accrued.  (Dkt. 66-2, ¶ 13.)

25         **3.     Plaintiff's NIED Claim Is Preempted by Workers' Compensation.**

26                    a.     Plaintiff's Evidence.

27         Plaintiff contends that the following conduct by Mr. Alao was "outrageous"

28  and inflicted emotional distress on him for purposes of Valeant's IIED and/or NIED

liability: (1) soliciting Plaintiff to provide access to Valeant data that Mr. Alao wanted to use illegally to benefit his own financial firm, and, after Plaintiff refused, retaliating against Plaintiff by (2) telling Plaintiff that he enjoyed "bloody" things such as firing people for "the fun of the bloodsport," (3) telling Plaintiff that he found it funny that the girlfriend of Jonah Shacknai, the founder of Medicis, committed suicide by hanging herself while naked from Mr. Shacknai's balcony, (4) subjecting Plaintiff to "exclusion" by "positioning himself away from [Plaintiff] in the shared office space" when he came to work in Scottsdale, (5) making false promises to Plaintiff regarding the possibility of relocating from Arizona to New Jersey.  (Dkt. 66-1, SGI at 7-8, citing Plaintiff's deposition and declaration.)

Regarding Mr. Alao's request for access credentials, Plaintiff testified at deposition that Mr. Alao asked him for "service account credentials for various systems" and "local administrator credentials" to use the information to benefit Mongran Financial.  (Dkt. 63-2 at 36, 39 [Plaintiff's Depo. at 61, 67].)   Plaintiff considered this an "improper request" because providing the information would have violated payment card industry standards.  (Id. at 39 [id. at 67].)

After Plaintiff complained, Mr. Alao did not reassign his job duties.  (Id. at 54 [id. at 128].)   Plaintiff observed that Mr. Alao "brought in multiple Nigerian consultants to be part of the company to help him in whatever he was doing."  (Id. at 41 [id. at 75].)  This concerned Plaintiff, because "they were also looking for the same type of credentials as Jacob."  (Id.)

Regarding Mr. Alao's "false promises," Plaintiff testified that near the end of July 2013, "I believe that Jacob called me up and – I'm quite sure that he gave me a heads up that they were going to be closing down basically Medicis [in Scottsdale] … and that he was going to work with … H.R., and potentially Brian Stolz, to come up with a relocation package for me."  (Id. at (71-72 [id. at 167-68].)  In response to that call, Plaintiff immediately spoke with Mr. Schiavone who told him, "Like I said before, I don't know anybody that's getting a relocation package to New Jersey.  It's

1  total B.S."[9]  (Id.)

2        b.     Analysis under California Law.

3       As discussed above, under California law, workers' compensation generally

4  provides the exclusive remedy for intentional or negligent infliction of emotional

5  distress claims that are based solely on alleged work-related activity.  See Cal. Lab.

6  Code § 3601(a) ("Where the conditions of compensation set forth in Section 3600

7  concur, the right to recover such compensation, pursuant to the provisions of this

8  division is ... the exclusive remedy for injury or death of an employee against any

9  other employee of the employer acting within the scope of his or her employment.").

10  Workers' compensation, however does not bar emotional distress claim "where an

11  employer's conduct exceeds the risks inherent in the employment relationship."

12  Grotz, 2012 WL 5350254, at *10.  Plaintiff argues that this exception applies,

13  because "Mr. Alao's conduct was far beyond the bounds of the employment

14  relationship …."  (Dkt. 66 at 16.)

15       Numerous courts have considered whether whistleblower retaliation is a

16  normal risk of employment and concluded that it is.  In Langevin v. Federal Express

17  Corp., a court in this District considered whether the exclusivity provisions of

18  California's Worker's Compensation Act barred a plaintiff's IIED claim — a claim

19  that was rooted in whistleblower retaliation.  No. 14-8105, 2015 WL 1006367 (C.D.

20  Cal. Mar. 6, 2015).  As the Langevin court explained, the California Supreme Court

21  has held that "whistleblower retaliation is […] a risk inherent in the employer

22  relationship."  Id. at *12 (quoting Miklosy v. Regents of the University of California,

23  44 Cal. 4th 876, 903 (2008)); see also Tone v. Wal-Mart Stores, Inc., No. 14-2643,

24  2015 WL 4658564, at *3 (S.D. Cal. Aug. 5, 2015) ("Miklosy held that the plaintiff's

25  _____

26      [9] At deposition, Plaintiff testified that Mr. Alao promised to take him along on visits to data centers in other states and to the 409 Club in Boston, but he never did

27  so.  (Dkt. 63-2 at 52 [Plaintiff's Depo. at 127].)  Plaintiff has wisely abandoned any claim that these "broken promises" constitute negligent or outrageous conduct.

28

1   claims were preempted by the [Worker's Compensation Act] because 'whistle

2   blower retaliation' is a risk inherent in the normal employment relationship.")

3   (citation omitted).

4        Following the California Supreme Court's determination that whistleblower

5   retaliation is inherent in the employer relationship, Plaintiff's IIED and NIED

6   claims are barred by California's Worker's Compensation Act.  For instance, the

7   plaintiff in Langevin alleged he was retaliated against because of his

8   whistleblowing and that he suffered emotional distress because of those retaliatory

9   actions.  Langevin, 2015 WL 1006367, at *12.  The court accepted these retaliatory

10  acts as true but ultimately found they were part of the normal employment

11  relationship.  Specifically, the Langevin court wrote: "The retaliatory acts alleged in

12  the complaint — i.e., writing Langevin up for pretextual and fabricated reasons;

13  yelling and screaming at him; seeking 'dirt' on Langevin that could be used to

14  discipline or demote him; being hostile to him; and demoting him are the type of

15  conduct that California courts, following Miklosy, have concluded falls within the

16  normal risks inherent in the employment relationship."  Id. (citations omitted); see

17  also Boehler v. Zillow, Inc., No. 14-1844, 2016 WL 6802487, at *4 (C.D. Cal. Mar.

18  28, 2016) (collecting cases holding same).

19       At worst, Plaintiff alleges that Mr. Alao retaliated against him for internally

20  complaining that Mr. Alao had asked Plaintiff for account access credentials so that

21  Mr. Alao could use account data for illegal purposes.  Following the above-cited

22  authorities, this workplace request and any subsequent retaliation in the form of

23  hostility, threatening him with termination, subjecting him to unpleasant gossip in

24  the office, or purposefully misleading him about the opportunity to relocate to New

25  Jersey, were normal risks inherent in the employment relationship.

26            c.    Analysis under Arizona Law.

27       Again, Arizona's workers' compensation statute provides the exclusive

28  remedy for injuries sustained by an employee against the employer or a co-employee

25

1    acting within the scope of his or her employment.  Ariz. Rev. Stat. Ann. § 23–

2    1022(A); Gamez v. Brush Wellman, Inc., 201 Ariz. 266, 269 (Ariz. Ct. App. 2001)

3    ("It is well settled that work-related injury claims are generally redressed exclusively

4    under Arizona's workers' compensation scheme.").   Injuries caused by an

5    employer's negligence fall under this exclusive remedies provision.  See Irvin

6    Investors, Inc. v. Superior Ct., 166 Ariz. 113,115-16 (Ariz. Ct. App. 1990) (holding

7    that the plaintiff's negligence claims against her former employer were barred by

8    Arizona's workers' compensation law, "which provides the exclusive remedy for

9    workers injured on the job").

10        An employee's NIED claim against an employer is, by definition, based on the

11   employer's negligence, so the exclusivity bar applies.  Eichenberger, 2014 WL

12   3819355, at *4–5 (barring plaintiff's NIED claim based on allegations her employer

13   failed to investigate and respond to her allegations of sexual harassment).  For the

14   same reasons, Plaintiff's NIED claim is barred by Arizona's workers' compensation

15   law.

16        4.    **Plaintiff's IIED Claim Fails for Lack of Outrageous Conduct.**

17              a.    Outrageous Conduct Defined.

18        The Second Restatement of Torts, on which both California and Arizona

19   courts rely to define the tort if IIED, defines "extreme and outrageous conduct" in

20   relevant part as follows:

21              [comment] d. *Extreme and outrageous conduct*.  The cases thus

22        far decided have found liability only where the defendant's conduct

23        has been extreme and outrageous.  It has not been enough that the

24        defendant has acted with an intent which is tortious or even criminal,

25        or that he has intended to inflict emotional distress, or even that his

26        conduct has been characterized by "malice," or a degree of

27        aggravation which would entitle the plaintiff to punitive damages for

28        another tort.  Liability has been found only where the conduct has

26

been so outrageous in character, and so extreme in degree, as to go

beyond all possible bounds of decency, and to be regarded as

atrocious, and utterly intolerable in a civilized community.  Generally,

the case is one in which the recitation of the facts to an average

member of the community would arouse his resentment against the

actor, and lead him to exclaim, "Outrageous!"

The liability clearly does not extend to mere insults, indignities,

threats, annoyances, petty oppressions, or other trivialities.  The rough

edges of our society are still in need of a good deal of filing down, and

in the meantime plaintiffs must necessarily be expected and required

to be hardened to a certain amount of rough language, and to

occasional acts that are definitely inconsiderate and unkind.  There is

no occasion for the law to intervene in every case where some one's

feelings are hurt.  There must still be freedom to express an

unflattering opinion, and some safety valve must be left through

which irascible tempers may blow off relatively harmless steam ….

Restatement (Second) of Torts § 46 (1965).

So as not to turn every workplace personality conflict, negative performance

review, or difference of opinion into a tort, courts have cautioned against applying

this definition too broadly in an employment setting.  See, e.g., Mintz v. Bell

Atlantic Sys. Leasing Intern., Inc., 183 Ariz. 550, 554 (1995) ("[I]t is extremely

rare to find conduct in the employment context that will rise to the level of

outrageousness necessary to provide a basis for recovery for the tort of intentional

infliction of emotional distress." (citation omitted)).  In Mintz, plaintiff was

hospitalized with severe emotional and psychological problems after failing to

receive a promotion she expected, and her employer ordered her back to work prior

to her doctor's recommended return date.  Id. at 552.  The plaintiff lasted only one

day at work before landing back in the hospital suffering from stress.  Id.  The day

27

1  after the plaintiff was admitted, her employer delivered a letter to her in the hospital

2  advising her that her duties had been reassigned.  Id.  The trial court granted the

3  defendant employer's motion to dismiss the plaintiff's IIED claim.  The court of

4  appeals agreed that the facts alleged did not rise to the extreme level of

5  outrageousness necessary to state a claim for IIED, stating "[t]he trial court has to

6  draw a line, and we find no error in where the line was drawn on the facts alleged

7  here." Id. at 555; see also Eichenberger, 2014 WL 3819355, at *3 (collecting cases

8  dismissing IIED claims against employers for failure to allege outrageous conduct).

9        Only when reasonable minds could differ in determining whether conduct is

10 sufficiently extreme or outrageous does the issue go to the jury.  Fuentes v. Perez,

11 66 Cal. App. 3d 163, 172 (1977) (finding contractors' failure to cover open roof

12 despite rainy weather report and repeated requests was not outrageous as matter of

13 law); Lucchesi v. Stimmell, 149 Ariz. 76, 79 (1986) (finding obstetrician's failure

14 to attend complicated delivery and failure to inform parents that he would not

15 attend before they agreed to be transported to his hospital potentially constituted

16 outrageous conduct).

17        b.    Mr. Alao did Not Engage in Outrageous Conduct.

18        Mr. Alao's remarks about "blood sport" and suicide, while distasteful, do not

19 rise beyond the level of "mere insults, indignities, threats, [and] annoyances" to "go

20 beyond all possible bounds of decency."  The comments did not even directly relate

21 to Plaintiff.  Compare Hughes v. Pair, 46 Cal. 4th 1035, 1051 (2009) (holding

22 sexually aggressive comments by trustee who controlled plaintiff's child trust,

23 including "I'll get you on your knees eventually.  I'm going to fuck you one way or

24 another," were not outrageous) and Kiseskey v. Carpenters' Tr. for So. California,

25 144 Cal. App. 3d 222, 229 (1983) (holding union members' threats "You are a no

26 good son of a bitch and if you don't resign the agreement and get in set with the

27 union, you'll be put in the hospital," and "Since you do not seem to be concerned

28 about your safety and well-being, maybe you will be concerned about the well-being

of your wife and children," were outrageous).

Similarly, Mr. Alao's decision to work at the "complete opposite end of the building" from Plaintiff's when he visited the Scottsdale office is not outrageous. (Dkt. 63-2 at 51 [Plaintiff's Depo. at 125].)  There is no evidence that Plaintiff even complained about this or requested that Mr. Alao work closer to him.

Plaintiff argues that merely offensive behavior may become outrageous when a defendant "knows the plaintiff is susceptible to injuries through mental distress" or "acts intentionally or unreasonably with the recognition that the acts are likely to result in illness through mental distress."  (Dkt. 66 at 14, citing Kiseskey, 144 Cal. App. 3d at 230.)  Plaintiff attempts to apply this rule to his IIED claim, arguing that he "suffers from multiple sclerosis as well as mood and behavior problems" and "communicated information regarding his illness and mental condition to his employer Valeant Pharmaceuticals, including his immediate supervisors.  [Plaintiff] even documented this fact on his employee intake forms when he was first hired." (Id.)  Plaintiff concludes from this that Mr. Alao mistreated Plaintiff "[d]espite this knowledge of [Plaintiff's] mental condition."  (Id.)

In fact, Plaintiff cites no evidence that Mr. Alao knew about Plaintiff's "mood and behavior problems."  Plaintiff cites no evidence that Mr. Alao, a New Jersey coworker, ever saw Plaintiff's employee intake form.  While Plaintiff may have communicated certain health information to his "immediate supervisors," he admits that "Mr. Alao was not my supervisor…."  (Dkt. 66-2 at ¶ 4.)

Even accepting that Mr. Alao solicited Plaintiff's assistance in wrongfully accessing account data, and even assuming that Mr. Alao knew that Plaintiff was ill, the undisputed facts are that (1) Plaintiff refused to provide the requested information, (2) Plaintiff reported Mr. Alao's request internally, (3) Plaintiff still wanted to work near Mr. Alao when he visited the Scottsdale office, (4) Even after this occurred, Plaintiff was able to interview successfully for the DataShield position, (5) Plaintiff subsequently spoke to Mr. Alao about the possibility of relocating to

New Jersey where Mr. Alao worked, although Plaintiff wanted a raise to do so, (6) Plaintiff eventually sent an email to Valeant asking for a severance package, and that email did not mention any conflict with Mr. Alao – to the contrary, it reported that Mr. Also had "briefly mentioned the possibility of a relocation package to New Jersey that would provide [Plaintiff] job security and continuous employment with Valeant," but Plaintiff did not want to relocate, (7) Valeant offered him a severance package that would have permitted him to continue working until October 2013, and (8) Plaintiff rejected that package; Plaintiff had requested an immediate separation followed by three months of severance pay – a severance period longer than his entire 85-day employment at Valeant.

Given these undisputed facts, Mr. Alao's treatment of Plaintiff during his brief employment at Valeant was not outrageous, as a matter of law.

## VI.

## CONCLUSION

Based on the foregoing, IT IS ORDERED that Defendant's motion for summary judgment is GRANTED and judgment shall be entered for Defendant and against Plaintiff. **Defendant shall submit a brief, concise proposed judgment to the Court within 10 days of the date of this Order.**

DATED:  August 10, 2017

_____
KAREN E. SCOTT
United States Magistrate Judge